## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

| | |
|---|---|
| EVERETT MYERS, | : |
| | : |
| **Plaintiff,** | : |
| | : |
| v. | : |
| | : |
| CAROLYN W. COLVIN, | : |
| Acting Commissioner, | : |
| Social Security Administration, | : |
| | : |
| **Defendant.** | : |
| | : |

Action No. 4:14-cv-32

## REPORT AND RECOMMENDATION

This matter is before the Court on *pro se* Plaintiff Everett Myers' ("Mr. Myers") complaint filed pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Defendant, the Acting Commissioner of the Social Security Administration ("Acting Commissioner"), denying Mr. Myers' claim for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act. Both parties have filed motions for summary judgment, ECF Nos. 10 and 11, which are now ready for recommended disposition. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002 Standing Order on Assignment of Certain Matters to United States Magistrate Judges. After reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J).

## I. PROCEDURAL BACKGROUND

On September 18, 2007, Mr. Myers initially filed his application for DIB, alleging a disability onset date of January 15, 1984, R. 203, due to "chronic obstructive pulmonary disease ["COPD"], sinusitis, asthma, macular degeneration, lower back pain, ringing in ears, post traumatic stress disorder ["PTSD"] and left knee injury," R. 244. To qualify for DIB, Mr. Myers was required to have insurance coverage at the time of his disability onset. 42 U.S.C. § 423(a); 20 C.F.R. §§ 404.101(a); 404.131(a). Mr. Myers' date last insured ("DLI") is December 31, 1989. R. 521. Accordingly, Ms. Martin has the burden of establishing the existence of a disability on or before that date. His application was initially denied on November 28, 2007, R. 136, and denied again upon reconsideration on January 31, 2008, R. 137. Mr. Myers then requested a hearing in front of an administrative law judge ("ALJ"), which was conducted on March 19, 2009. R. 62-112. The ALJ, Judge Irving A. Pianin, issued a decision denying Mr. Myers' DIB application on April 10, 2009. R. 141-49. On August 27, 2009, the Appeals Council granted Mr. Myers' request for review, vacated Judge Pianin's decision, and remanded the case on the grounds that Judge Pianin used the wrong DLI in denying Mr. Myers' application, and Judge Pianin failed to explain the weight given to the non-examining state agency opinions. R. 151-52. Thereafter, on May 5, 2010, following another hearing, Judge Pianin denied Mr. Myers' application again. R. 16-25. Though Mr. Myers appealed the decision, the Appeals Council denied the request for review on February 12, 2011, R. 3-5, rendering Judge Pianin's denial of benefits the final decision of the Acting Commissioner. After exhausting his administrative remedies, Mr. Myers filed his complaint for judicial review of the Acting Commissioner's decision on June 16, 2011. R. 541. On September 28, 2012, the United

States District Judge of the Eastern District of Virginia, Judge Raymond A. Jackson, adopted in full the recommendation of Magistrate Judge F. Bradford Stillman, and remanded the case to the Acting Commissioner for further proceedings on three grounds: first, that "[t]he ALJ improperly relied on inferences based on [Mr. Myers'] condition after 1989, citing treatment records and billing statements dated after 1991. The ALJ applied the incorrect legal standard by doing so," R. 545 (citation omitted); second, "that the ALJ's consideration of Ms. Myers' testimony [was] not supported by substantial evidence," R. 547, because the ALJ failed to "to "discuss [her] testimony specifically and make explicit credibility determinations," R. 546 (citing *Morgan v. Barnhart*, 142 F. App'x 716, 731 (4th Cir. 2005) (Gregory, J., dissenting)); and third, "[t]he ALJ failed to elicit any explanation for the discrepancies between [Ms. Edith Edwards' testimony, the Vocational Expert ("VE"),] and [the Dictionary of Occupational Titles' ("DOT")] description for each of the jobs that the VE identified," R. 549. Upon remand from this Court, the Appeals Council vacated Judge Pianin's May 5, 2010 decision and remanded Mr. Myers' case to a different ALJ than had previously adjudicated Mr. Myers' application for benefits. R. 649. On July 9, 2013, an ALJ, Judge William T. Vest, Jr., conducted a hearing at which Mr. Myers, Mr. Myers' counsel, Ms. Joyce Myers, and a VE appeared. R. 550-618. After the hearing but before issuing a decision, Judge Vest prepared interrogatories for the VE, Mr. George Steroska, in order to address this Court's prior decision which found Judge Pianin's failure to explain the discrepancy between the VE's testimony and DOT to be erroneous. R. 710-712. Although Mr. Myers' attorney objected to the entry of the interrogatories into evidence, Judge Vest overruled the objection, holding the record open for an additional ten days to allow counsel time to submit evidence or argument; Mr. Myers' attorney apparently declined to augment the record in any

3

way during that time. R. 692, 717. Subsequently, on November 8, 2013, Judge Vest denied Mr.

Myers' application for DIB, finding that Mr. Myers' could perform the jobs of either mail sort

clerk (DOT No. 209.587-010) or clerical sorter (DOT No. 209.687-022) through his DLI. R.

518-33. Judge Vest's notice of denial indicated that Mr. Myers had thirty (30) days to file

written exceptions to the Appeals Council from the date he received the notice, and the Appeals

Council would assume that Mr. Myers received the notice five days after it was issued unless Mr.

Myers proved otherwise. R. 515-17. By letter dated December 20, 2013, Mr. Myers' submitted

a request for review, R. 509-14, but the Appeals Council found that Mr. Myers failed to timely

file exceptions and rejected his request for review, R. 500-02. Accordingly, Judge Vest's

November 8, 2013 unfavorable decision became the final decision of the Acting Commissioner.

Mr. Myers filed his *pro se* complaint for judicial review of the Acting Commissioner's final

decision on March 24, 2014. ECF No. 3. The Acting Commissioner filed an Answer on May

16, 2014. ECF No. 5. Mr. Myers filed his Motion for Summary Judgment on July 1, 2014, ECF

No. 10, and the Acting Commissioner filed a Cross-Motion for Summary Judgment on August 6,

2014, ECF No. 121. Thereafter, Mr. Myers filed a Brief in Response to the Acting

Commissioner's Cross-Motion on August 19, 2014. ECF No. 14. No additional briefing was

filed, and the time to do so has expired. Accordingly, the matter is ripe for recommended

disposition.

## II. RELEVANT FACTUAL BACKGROUND

In his application, Mr. Myers alleged a disability onset date of January 15, 1984, R. 203,

with a DLI of December 31, 1989, R. 521. As of his DLI, Mr. Myers was a 44-year old[1] male

---

[1] Mr. Myers' age classifies him as a "younger individual" as of his DLI. 20 C.F.R. § 404.1563.

who had graduated from high school and had completed at least four years of college. R. 251. At the hearing on July 9, 2013, Mr. Myers provided the following testimony:

Mr. Myers testified that he is presently married having been divorced in 2004, but remarried in 2005, R. 572, and has lived in Virginia since 1992, R. 579. Mr. Myers last worked as a city manager in Miami Springs from 1981 to 1985. *Id.* Prior to that, Mr. Myers worked as a county administrator of Isle of Wight County, Virginia. R. 566-67. Mr. Myers served in the Navy from 1962 through 1968. R. 562. While in Vietnam from 1965 to 1967, Mr. Myers was under fire routinely from enemy forces while "assist[ing] in the raising of the Jamaica Bay, which was the . . . world's largest dredge." R. 563. Many years later, Mr. Myers first experienced symptoms of PTSD after he fired a police chief in 1984, and he received threats of physical violence and had garbage thrown on his lawn in response. R. 564-65, 567. After that, Mr. Myers' symptoms of PTSD and COPD were exacerbated to the point that he resigned from his position as city manager. R. 567. Mr. Myers' PTSD symptoms included hyper vigilance, paranoia, intolerance of noise and activity, and an inability to get along with others. R. 586. Mr. Myers also testified that between 1981 and 1985 he was having difficulty walking and standing due to COPD, R. 577, and that he was forced to end his job as city manager in 1985 because he "couldn't move . . . didn't have any air [and] he didn't have any breath," R. 577-78 ("[I]f I'd get up off of my chair and I'd walk from here to that machine there, I'd be totally out of breath."). Mr. Myers stayed in Florida after leaving his position as city manager until 1992. R. 579. During this time, Mr. Myers stated that he could not do any house work or chores, and his wife hired a woman to clean the house and prepare meals; although, he occasionally drove to the grocery store. R. 580. Mr. Myers did not watch television or socialize, but rather, spent his time

"sitting at home with the shades drawn" from the time he last worked in 1985, until he moved back to Virginia in 1992, after his Florida home was damaged by a hurricane. R. 579, 582.

The medical evidence existing in the record prior to Mr. Myers' DLI regarding Mr. Myers' PTSD includes a June 1988 insurance form, which indicates a diagnosis of PTSD and Adjustment Disorder with Mixed Emotional Features. R. 447. Also, included is a letter from Dr. Brainard Hines, dated June 18, 2007, stating that Dr. Hines began treating Mr. Myers for his PTSD in June of 1988 and continued treating him until 1993.[2] R. 338. On May 26, 2009, Dr. Hines wrote another letter, which provides the only evidence of Dr. Hines' treatment of Mr. Myers in the record:

> At the time I initially evaluated Mr. Myers, he was suffering with symptoms of Posttraumatic Stress Disorder (DSM IV 309. 81), including fear, hyper vigilance, panic attacks, and intrusions of traumatic memories, avoidance and maladaptive coping. The symptoms were related primarily to his experiences while serving in Vietnam and significantly impaired his ability to work at that time. The symptoms continued for at least two years following his initial visit with me and imposed severe constraints on his ability to work, interact socially and maintain personal relationships during that time, and thereafter.

R. 499. Although Mr. Myers stated that he had attempted to get medical records dating from 1984, he was informed that the records had been destroyed. R. 585. Mr. Myers' treatment with Dr. Hines ended after five years when Mr. Myers' wife's insurance ended. R. 605.

The earliest records of Mr. Myers' treatment for COPD are from July 20, 1989 when Mr. Myers was diagnosed with asthma bronchial and COPD by Dr. Mark E. Kutner. R. 369. Since then, Mr. Myers has been seen by multiple physicians for his various conditions including COPD, asthma, pneumonia, and nasal polyps. R. 319-67. In 1998, Mr. Myers presented to an

---

[2] The record evidences some discrepancy regarding when Mr. Myers moved back to Virginia. *Compare* R. 579 (indicating that Mr. Myers moved to Virginia in 1992), *with* R. 338 (indicating that Dr. Hines treated Mr. Myers in Florida until 1993).

emergency room in Colorado complaining of "extreme shortness of breath." R. 305. Mr. Myers indicated that "[h]e had been cutting weeds with a brush hog at his mother's home in Las Animas for several days" as he was "visiting his mother." *Id.* Moreover, Mr. Myers "describe[d] himself as health[y] with no other medical problems. He state[d] that he has had a diagnosis of asthma and chronic lung disease. He had an episode of pneumonia but could not describe any other triggers." *Id.* From 1991 to 2003, Mr. Myers had nasal polyps removed on five occasions. R. 22. Prior to his last nasal polypectomy in 2003, Mr. Myers indicated that he was "feeling quite good now[,] [and] [v]oice[d] no complaints." R. 397.

In 2007, Mr. Myers completed a Function Report, indicating that he had difficulty breathing at night, R. 254, and needed reminders to take medication, R. 555. Although Mr. Myers prepared breakfast for himself, he did little house work, and usually only left the house to go grocery shopping about twice a week. R. 256. Mr. Myers stated that he was capable of paying bills, counting change, and using a checkbook. *Id.* Moreover, Mr. Myers' hobbies and interests included reading the newspaper at McDonald's twice a week and watching the History Channel for three or four hours per day. R. 257.

On March 24, 2008, the Department of Veterans Affairs (the "VA") assigned Mr. Myers a 100 percent disability rating due to his PTSD effective as of October 4, 2006. R. 174. In so doing, the VA cited a March 2008 examination at which Mr. Myers indicated "symptoms of increased drinking, depressed mood, insomnia, nightmares, irritability, anger, isolation from others, inability to hold down a job, confusion, memory deficits, and inability to form relationships." R. 177. Moreover, the VA noted that Mr. Myers' "appearance and hygiene were

not appropriate and showed signs of neglect," and "Mr. Myers' "[c]ommunication was grossly impaired." *Id.*

### III. JUDGE VEST'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

Under the Social Security Administration regulations, a sequential five-step analysis evaluation of a disability claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. § 404.1520. In evaluating Mr. Myers' disability claim, Judge Vest followed the five-step sequential analysis pursuant to 20 C.F.R. §§ 404.1520(a) and 416.920(a), considering whether Mr. Myers: (1) was engaged in substantial gainful activity, R. 521; (2) had a severe impairment, R. 522; (3) had an impairment that meets or medically equals a condition within the SSA's listing of impairments, R. 522-25; (4) had an impairment that prevents past relevant work, R. 530-31; and (5) had an impairment that prevents him from any substantial gainful employment, R. 531-35. Between steps three and four, Judge Vest determined Mr. Myers' residual functional capacity ("RFC") upon considering all of his impairments.

Specifically, Judge Vest found first that Mr. Myers met the insured requirements of the Social Security Act through December 31, 1989, and he had not engaged in substantial gainful activity ("SGA") since January 15, 1984, the alleged onset date of disability. R. 521. Second, Mr. Myers had the following severe impairments: "Anxiety Disorder (PTSD); Mood Disorder (Adjustment Disorder with Mixed Emotional Features); Chronic Obstructive Pulmonary Disease (COPD); Asthma; [and] Chronic Sinusitis with Polyps." R. 522 (citing 20 C.F.R. § 404.1520(c)). Judge Vest found the other alleged impairments—including "disability due to macular degeneration, lower back pain, ringing in the ears, and a left knee injury"—were "not

medically determinable during the relevant time period" because "there [was] no evidence other than the claimant's subjective complaints to show that these impairments caused significant work-related limitations through the date last insured." R 522.

Third, Judge Vest determined that Mr. Myers did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 22 (citing 20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526). Specifically, Judge Vest found Mr. Myers failed to make the requisite showing for a respiratory listing. R. 522. He also found that Mr. Myers' mental impairments were non-severe because he "did not have any 'marked' limitations or repeated episodes of decompensation, each of extended duration, through the date last insured." R. 522-23. In so finding, Judge Vest determined that Mr. Myers "had moderate restriction" in the activities of daily living, social functioning, concentration, persistence and pace. R. 523-24 (discussing the "paragraph B" and "paragraph C" criteria in 12.00C Listing). In activities of daily living, Judge Vest cited Mr. Myers' testimony that he spent his time from 1985 through 1989 "sitting and thinking in a chair at his home," and Ms. Myers' statements that "he could not go anywhere or do anything, and even though he could feed himself, he had trouble eating because of his breathing." R. 523. Most recently at the July 2013 hearing, Mr. Myers "reported that he sat in his home with the curtains drawn and thought people were after him." *Id.* Judge Vest then discussed the medical records, noting first that the medical record contained little evidence for the relevant time period. R. 522. Accordingly, Judge Vest relied predominantly on medical records dated after Mr. Myers' DLI, citing records from 1998 when Mr. Myers traveled to Colorado to visit his mother, and a 2008 report finding, in part, that Mr. Myers could shop for groceries, pay bills, read the

newspaper and watch TV. R. 522-23. In considering Mr. Myers' social functioning, Judge Vest considered Dr. Hines' letters, which stated that Mr. Myers' symptoms of PTSD imposed "severe constraints" on his social functioning. R. 524. However, Judge Vest noted that Dr. Hines "did not describe specific social limitations" nor "make any comments about [Mr. Myers'] work abilities, or the severity of [the] impairments." *Id.*  Judge Vest also cited records which indicated that Mr. Myers was able to travel cross-country, had some friendships, and went to public places, like the grocery store and McDonalds. *Id.* Finally, in determining Mr. Myers' concentration, persistence and pace, Judge Vest relied on Mr. Myers' 2007 Disability Application which indicated that he "had intact judgment and insight, intact memory for recent and remote events, and no depression, anxiety or agitation on examination." *Id.* Although later in 2008, Mr. Myers did have "a mental status examination [which] indicated that he had impaired thought processes, memory, concentration and communication[,] [c]onsidering the totality of the evidence," Judge Vest found that Mr. Myers did not have any marked limitations through his DLI. *Id.*

Next, Judge Vest determined that Mr. Myers had the RFC to perform sedentary work with certain limitations.[3] R. 525 (citing 20 C.F.R. § 404.1567(a)). Thus, Judge Vest concluded that Mr. Myers was not under disability between the period of January 15, 1984, to December 31, 1989. R. 530. In support of this conclusion, although Judge Vest found that Mr. Myers' impairments could cause the symptoms he alleged, Judge Vest determined that Mr. and Ms.

---

[3] Those limitations include:

He could lift and carry 10 pounds occasionally, sit for 6 hours in an 8-hour day, and stand or walk for 2 hours in an 8-hour day.  He could perform jobs involving no climbing, no work at unprotected heights or around dangerous machinery, and no exposure to excessive amounts of smoke, dust or other air pollutants.  He could perform no more than simple, repetitive jobs tasks without frequent interaction with the general public.

R. 525

Myers' "statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible." R. 527. Specifically, Judge Vest summarized medical reports and evidence dating back to June of 1988, and gave moderate to little weight to Ms. Myers' testimony on the grounds "that she had an intimate, not professional, relationship with [Mr. Myers] and appears biased in his favor. . . . for example, she reported that she supported him most of her life, felt bad for him, and had promised his mother that she would take care of him no matter what." R. 528. Moreover, Judge Vest noted that although Mr. and Ms. Myers testified that Mr. Myers' PTSD symptoms were present before his DLI, "the record contains no medical evidence of mental health treatment prior to 1988. [Mr. Myers] has admitted that he did not start treatment for these issues until that year, over four years after his alleged onset date." R. 529. Judge Vest also assigned less weight to the VA's disability rating because of the VA's "heavy reliance on evidence from 2008, nearly 18 years after [Mr. Myers'] date last insured." R. 530 (citing *Bird v. Commissioner of Social Security*, 699 F.3d 337 (4th Cir. 2012)). Additionally, Judge Vest gave little weight to Dr. Hines' letters, stating:

> At the time of these statements, Dr. Hines had not treated the claimant for over 10 years, and he had no progress notes or other documentation to support his assessment of the claimant's condition from 1988-1993. Furthermore, his statements are vague; the phrases "significantly impaired" and "severe constraints" do not describe specific work-related limitations. These statements, moreover, are less persuasive in light of the claimant's very conservative treatment course during the relevant time period. Dr. Hines's letters do not shed light on why the claimant's treatment was so conservative when his symptoms were purportedly causing severe limitations in several areas of his life, nor do they explain the claimant's apparent lack of treatment after 1993 (the claimant alleges that he had no insurance to receive further treatment, but he was able to receive treatment and medication for his sinus and respiratory issues).

*Id.* Finally, Judge Vest relied on Mr. Myers' statement in 1998, which he made while he was visiting his mother in Colorado and helping her with yard work, wherein he described himself as

11

"health[y] with no other medical problems" as "evidence [which] brings into question [Mr. Myers'] and his former wife's statements that [Mr. Myers] has basically been unable to do anything since he stopped working in the mid-1980s." *Id.*

In the fourth step, Judge Vest concluded that based on all of the evidence in the record, and given his RFC, Mr. Myers was unable to perform any of his past relevant work since his work as a city manager and county administrator was skilled and exceeded his RFC. R. 530-31 (citing 20 C.F.R. 404.1565).

Finally, Judge Vest found that through his DLI, there were jobs that existed in significant numbers in the national economy that Mr. Myers could have performed. R. 531 (citing 20 C.F.R. 404.1569; 404.1569(a)). Specifically, Judge Vest relied on the Ms. Edwards' testimony in finding that Mr. Myers could perform the jobs of mail sorter and clerical sorter. R. 531. In addressing the District Court's concern about the inconsistency between the VE's testimony and the DOT definition, Judge Vest questioned the VE, Mr. George Steroska, as to whether the jobs Mr. Steroska identified at the hearing could be performed by an individual limited to unskilled work with Mr. Myers' RFC. *Id.* Mr. Steroska testified that although the position of clerical sorter is classified as a semiskilled rather than unskilled position by the DOT, based on his experience, it is commonly performed at the unskilled level. R. 532. In his written decision, Judge Vest addressed Mr. Myers' contention that Mr. Steroska's testimony was "highly speculative based on merely his 'best guess," in finding that Mr. Steroska's testimony and responses were based on his professional experience. *Id.* (citing the VE's Resume, R. 684-86).

On judicial review, Mr. Myers challenges the final decision of the Acting Commissioner, arguing that Judge Vest erred when he concluded that Mr. Myers was not disabled:

1) "The ALJ ignored and disregarded the Order of the USDC to reassess the Plaintiff's credibility determination including an explanation of the weight given to the Plaintiff's statements." ECF No. 10 at 8.

2) "The ALJ ignored and disregarded the Order of the USDC to discuss the testimony of Plaintiff's ex-wife specifically and make explicit credibility determinations." *Id.* at 11.

3) "The ALJ ignored and disregarded the Order of the USDC to address the conflict between the VE's testimony and the DOT, including the consideration of additional vocational testimony if necessary." *Id.* at 13.

4) "Plaintiff contends it was error for the ALJ to invoke a 30 day appeal period after conducting a full disability hearing." *Id.* at 17.

5) "Plaintiff contends that it was error for the Appeals Council to not invoke their duty and obligation of 'fair play' to review the decision of the ALJ. As an alternative matter, Plaintiff also contends that all of the essential evidence was before the Appeals Council when it denied review, and that the evidence established without any doubt that the claimant was disabled." *Id.* at 19.

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Acting Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.

It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

In determining whether the Acting Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Acting Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

### 1. *Judge Vest Properly Relied on Post-1989 Evidence when Considering Mr. and Ms. Myers' Credibility*[4]

Mr. Myers argued that Judge Vest improperly relied on evidence dated after 1989 when determining that Mr. and Ms. Myers were not fully credible,[5] claiming that the District Court specifically limited Judge Vest to considering only pre-1989 evidence. ECF No. 10 at 10. Mr. Myers is correct that Judge Jackson determined that Judge Pianin's reliance on medical evidence post-1989 was erroneous:

[N]one of the evidence regarding Plaintiff's symptoms and treatment prior to December

---

[4] Because Mr. Myers's Claim I and II involve the same legal claims, the undersigned will consider them together, noting any differences between Mr. and Ms. Myers' testimony and Judge Vest's corresponding credibility determination as needed.

[5] Mr. Myers also claimed that "the ALJ never once wrote that the Plaintiff's direct testimony was not credible," and "the ALJ never once wrote that Ms. Myers [sic] <u>direct</u> testimony was not credible." ECF No. 10 at 11 (emphasis in original). This is simply incorrect as the ALJ explained in detail his rationale for finding that Mr. and Ms. Myers were "not entirely credible." *See* R. 526-30.

31, 1989 is inconsistent with his testimony at the administrative hearing. The appropriate inquiry measures Plaintiff's claims prior to December 31, 1989, his date last insured. The ALJ improperly relied on inferences based on Plaintiff's condition after 1989, citing treatment records and billing statements dated after 1991. The ALJ applied the incorrect legal standard by doing so.

R. 545. Judge Jackson's decision, then, was based on the inference that because Judge Pianin was barred from considering evidence after 1989, and there was little to no substantial evidence pre-1989, then Mr. Myers' statements could not be inconsistent with the medical record. Indeed, Mr. and Ms. Myers' testimony could not be inconsistent with a record that, in large part, did not exist pre-1989. However, Mr. Myers' argument about the Judge Vest's use of post-1989 evidence fails to consider the Fourth Circuit's recent decision in *Bird v. Commissioner*, 699 F.3d 337 (4th Cir. 2012), which was published after the District Court's remand, but before Judge Vest's decision.

In *Bird*, the Fourth Circuit held that "[m]edical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI." *Id.* at 340 (citing *Wooldridge v. Bowen*, 816 F.2d 157, 160 (4th Cir. 1987)). For an ALJ to rely on evidence after the DLI insured, however, there must be a "link" between the post-DLI evidence and the alleged disability. *Id.* at 341. For example, the Fourth Circuit cited *Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005), in which the Fourth Circuit found that reliance on post-DLI evidence to prove a different impairment "not linked in any matter to the claimant's condition before her DLI" would be error. *Id.* To "permit[] an inference of linkage," then, there must be "evidence that these impairments existed before the claimant's DLI." *Id.* Here, that link is Mr. and Ms. Myers' own testimony. Mr. Myers' testified that he was "sitting at home with the shades drawn" from 1985, the year Mr.

Myers last work, until 1992, when he relocated to Virginia. R. 582. Ms. Myers further testified

that from 1984 until the present, she believed Mr. Myers' condition had stayed "the same if not

worse." R. 603. Their testimony, then, is the "evidence that [Mr. Myers'] impairments existed

before [his] DLI," *Bird*, 669 F.3d at 340, and accordingly, Judge Vest was entitled to link their

testimony to evidence post-1989 to verify the allegations, *see id.* at 341 ("[E]vidence created

after a claimant's DLI, which permits an inference of linkage between the claimant's post-DLI

state of health and her pre-DLI condition, could be the 'most cogent proof' of a claimant's pre-

DLI disability."). This new rule announced in *Bird* did not exist when the District Court entered

its remand order in September of 2012. *Bird* was decided on November 9, 2012, and Judge

Vest's decision was dated November 8, 2013. Accordingly, Judge Vest properly relied on

evidence after Mr. Myers' DLI.[6]

## 2.   *Judge Vest Appropriately Limited the Appeals Period to 30-Days, and the Appeals Council Properly Denied Review*

In his fourth claim, Mr. Myers contended that Judge Vest improperly utilized a thirty day

appeals period because the deadline was imposed "in an unsigned perfunctory or boiler-plate

language," and Judge Vest's explanation of the deadline was "confusing and contradictory."

ECF No. 10 at 17-18. A plain reading of Judge Vest's correspondence with Mr. Myers renders

Mr. Myers' allegations meritless. First, Judge Vest's notice clearly indicated no less than four

times that Mr. Myers had thirty days in which to file exceptions or request an extension of time

with the Appeals Council. R. 515-16. Mr. Myers argued that the letter's language stating that

---

[6] Although at first blush this finding may appear to conflict with the undersigned's analysis in Section V.3., one exception to the mandate rule is permitted when "'controlling legal authority has changed dramatically.'" *United States v. Bell*, 5 F.3d 64, 67 (4th Cir. 1993) (quoting *United States v. Bell*, 988 F.2d 247, 251 (1st Cir. 1993)). Accordingly, although Judge Jackson's direction to refrain from considering post-DLI evidence was arguably part of the Court's mandate, because the law "changed dramatically" in *Bird*, Judge Vest was permitted to deviate from the Court's Remand Order on this discrete issue. *See infra* n. 15.

Judge Vest's decision would "become final on the 61st day following the date of this notice ... [i]f you do not file written exceptions and the Appeals Council does not review my decision on its own," R. 516, along with Mr. Myers' counsel's reliance on "SSA materials,"[7] ECF No. 10 at 18, led Mr. Myers' counsel to believe he had sixty days in which to file exceptions. However, Mr. Myers failed to proffer an explanation as to how counsel overlooked the repeated reference to the thirty-day deadline, R. 515-17, or explain why counsel believed the date of finality for appeal to the federal district would apply to the deadline for filing exceptions to the Appeals Council, *see* R. 516 (listing the date that the ALJ's decision would become final within the discussion of how to file an action to the federal district court). Judge Vest's notice can hardly be interpreted as "confusing or contradictory," ECF No. 10 at 18, when it reiterated the thirty-day deadline repeatedly, and references to other deadlines were included in separate sections from that which listed the time to file written exceptions, *see* R. 515-16 (listing the thirty day deadline under the heading "Time Limit to File Written Exceptions," and the sixty day deadline under "Filing an Action in Federal District Court"). Furthermore, the undersigned rejects Mr. Myers' fifth claim that the Appeals Council was under a "duty and obligation of 'fair play' to review the decision of the ALJ." ECF No. 10 at 20. The Appeals Council, contrary to Mr. Myers' claim, is not obligated to review an ALJ's decision; rather, its review is discretionary. *Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir. 1986) (citing 20 C.F.R. § 404.969). Accordingly, the Appeals Council was not under any duty to review Mr. Myers'

---

[7] Besides citing various sections of the Program Operations Manual System ("POMS"), Mr. Myers provided no argument as to why counsel allegedly chose to rely on these sections. Indeed, Mr. Myers and his counsel blatantly ignored not only Judge Vest's direction, but also POMS 03101.010(A)(1)'s provision that a claimant has thirty days to file exceptions to the Appeals Council in a case remanded by a federal court. Moreover, 20 C.F.R. § 404.984(b) outlines the Appeals Council's review of an ALJ's decision after remand by a federal court and provides a thirty-day deadline for the filing of exceptions.

claim, and it did not err when it strictly applied the thirty-day deadline for the filing of exceptions, barring review of Mr. Myers' exceptions as untimely.[8]

### 3. Judge Vest Exceeded the Scope of the Remand Order by Changing Mr. Myers' RFC and Assigning Mr. Myers a Reasoning Level 2

Finally, Mr. Myers claimed that the ALJ "ignored and disregarded" the District Court's direction to resolve any inconsistency between the VE's testimony and the DOT. ECF No. 10 at 14. He argued that Judge Stillman and Judge Jackson found "that Myers had a Level 1 reasoning development," and thus, Judge Vest erred by failing to explain how the jobs identified by the VE, Mr. Steroska, could be performed by an individual with a Reasoning Level 1. *Id.* Although Mr. Myers' argument, as presented to the Court, is based on conclusory allegations without any citation to relevant legal authority, the undersigned finds that it has merit to the extent that it challenges Judge Vest's deviation from the Reasoning Level assigned by Judge Pianin, and Judge Vest's failure to respond to the District Court's directive to explain the discrepancy between Ms. Edwards' proposed jobs for Mr. Myers and the DOT definitions. Indeed, instead of addressing the discrepancy between the identified jobs and the corresponding DOT definitions, Judge Vest bypassed the District Court's direction by changing Mr. Myers' Reasoning Level altogether. Thus, Judge Vest resolved any apparent discrepancy between the VE's testimony and

---

[8] Mr. Myers also argued that "the evidence established without any doubt that the claimant, Myers was disabled." ECF No. 10 at 21. Mr. Myers cited to *Seavey v. Barnhart*, 276 F.3d 1, 11 (1st Cir. 2001) which noted that "a judicial award of benefits would be proper where the proof of disability is overwhelming or where the proof is very strong and there is no contrary evidence." *Id.* (citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985)). Besides this conclusory statement and citation to *Seavey*, Mr. Myers provided no argument in support of this claim, or proffered what evidence was "overwhelming" in Mr. Myers' case. Although district courts are to liberally construe *pro se* petitions and pleadings, *Haines v. Kerner*, 404 U.S. 519, 520 (1972), courts are not required to "discern the unexpressed intent of the plaintiff," *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006). "Though [*pro se*] litigants cannot, of course, be expected to frame legal issues with the clarity and precision ideally evident in the work of those trained in law, neither can district courts be required to conjure up and decide issues never fairly present to them." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1276 (4th Cir. 1985). Faced with Mr. Myers' silence as to the supporting grounds for this claim, the undersigned finds that Mr. Myers' Claim V is meritless.

the DOT, not by explaining it as the District Court had directed, but by changing the premise of the identified discrepancy. To arrive at this conclusion, the undersigned will consider first the general interplay between the VE and DOT definitions. Next, the undersigned will more fully explain Judge Vest's alteration of Mr. Myers' RFC and its implications. Additionally, the undersigned will explain the law-of-the-case doctrine and mandate rule, and outline the scope of Judge Jackson's Remand Order. Finally, the undersigned will apply the law-of-the-case doctrine and mandate rule to Judge Vest's action of changing Mr. Myer's Reasoning Level, finding that such alteration violated both the law-of-the-case doctrine and the mandate rule.

### A. Interaction between the VE and DOT definition

The DOT job descriptions include a "General Educational Development" ("GED") definition component which "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." Appendix C: Components of the Definitions Trailer, Dictionary of Occupational Titles, at § III, *available at* www.occupationalinfo.org/appendxc_1.html. The GED is comprised of three distinct components: Reasoning Development ("Reasoning Level"), Mathematical Development, and Language Development. *Id.* The GED's Reasoning Levels range from Level 1, the lowest level, to Level 6, the highest. *Id.* For example, an individual with Reasoning Level 1 can "[a]pply commonsense understanding to carry out simple one- or two-step instructions. [The individual can] [d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id.* An individual with a Reasoning Level 2 can "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. [The individual can] [d]eal with problems involving a few concrete variables in or from

standardized solutions." *Id.* Social Security Ruling 00-4P provides that while "[o]ccupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT," if "there is an apparent unresolved conflict between the VE or VS evidence and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4P, 2000 WL 1898704, at *2.

### B. Factual and Procedural Background

Judge Pianin determined that Mr. Myers's RFC was limited to sedentary work, with the additional limitations that "it required the performance of only simple and routine 1-2 step tasks due to moderate limitations in concentration, persistence and pace." R. 20. Accordingly, Judge Pianin questioned the VE, Ms. Edwards, as to whether any sedentary, unskilled work would be available to an individual with Mr. Myers's age, education, work experience, and RFC. R. 132. Ms. Edwards proposed three different jobs—unskilled office clerk, surveillance system monitor, and bench assembler. R. 132-33. Ms. Edwards did not proffer the corresponding DOT definitions at the hearing, but when questioned by Judge Pianin as to whether her testimony was consistent with the DOT, she responded affirmatively. R. 133.

Judge Stillman raised the issue of the apparent conflict between Ms. Edwards' testimony and the DOT *sua sponte.* R. 39. Although Judge Pianin did not specify which reasoning level he was assigning to Mr. Myers, he determined that Mr. Myers was limited to unskilled, sedentary work, and performing simple and routine 1-2 step tasks due to moderate limitations in concentration, persistence and pace. R. 20. Judge Stillman, then, determined that Judge Pianin's statement of Mr. Myers' RFC "correspond[ed] to the DOT's definition of Level 1 Reasoning

Development . . . which applies to occupations requiring the worker to '[a]pply commonsense understanding to carry out simple one- to two-step instructions' and '[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job.'" United States Magistrate Judge's Report and Recommendation, No. 4:11cv62, at 42 (E.D. Va. July 6, 2012) [hereinafter Report & Recommendation] (quoting Appendix C – Components of the Definition Trailer). Judge Stillman examined the corresponding DOT definitions for each of the jobs identified by Ms. Edwards, finding that each required a Reasoning Level of 2, 3, or 4. *Id.* at 43-45. Accordingly, Judge Stillman found that Judge Pianin's failure to elicit from Ms. Edwards "any reasonable explanation for the conflict," or "specific vocational evidence to suggest that these jobs should be classified as unskilled sedentary positions requiring Level 1 reasoning development notwithstanding the DOT descriptions," was ultimately fatal to Judge Pianin's ruling. *Id.* at 45-46. Moreover, Judge Stillman opined that the failure to elicit testimony from Ms. Edwards that, notwithstanding the DOT's contradictory definition, one of the jobs could be classified as a Reasoning Level 1 or that other jobs existed that Mr. Myers could perform was "not harmless," as this consideration might have very well rendered a "different outcome." *Id.* at 46-47

Judge Jackson adopted in whole the recommendation of Judge Stillman, and further explained the ALJ's role in clarifying discrepancies between the VE's testimony and the DOT, holding that although "the Fourth Circuit Court of Appeals has yet to address what level of inquiry the ALJ is required to make, other courts have found that an ALJ must elicit an explanation where the VE's testimony as to availability of jobs conflicts with the DOT." R. 548-49 (citing *Cordova v. Astrue*, No. 10-cv-01294, 2011 WL 3236077 (D. Colo. July 28, 2011);

*Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008)). Judge Jackson then identified Judge

Pianin's error as his "fail[ure] to elicit any explanation for the discrepancies between the VE

testimony and DOT description for each of the jobs that the VE identified. This explanation is

necessary to provide sufficient basis for review." R. 549.

Upon remand, Judge Vest determined that Mr. Myers' RFC was limited to "perform[ing]

sedentary work . . . . [with] no more than simple, repetitive job tasks without frequent interaction

with the general public." R. 525 (omitting any reference to a limitation of performing one- or

two-step tasks). Judge Vest then proposed a hypothetical individual of Mr. Myers' age,

education, work experience, and RFC to the VE, Mr. Steroska, who testified that such an

individual could perform the jobs of surveillance monitor/video monitor, mail sorter, and clerical

sorter. R. 531-32. Without being prompted by Judge Vest, Mr. Steroska testified that although

the DOT classified a clerical sorter as semiskilled with a Specific Vocational Preparation

("SVP") of 3,[9] based on his experience, it was commonly an unskilled position. *Id.* More

importantly, however, Judge Vest sent Mr. Steroska interrogatories after the hearing "[t]o

address the District Court's concerns regarding the consistency of the claimant's residual

functional capacity and the D.O.T. General Educational Developmental (GED) Reasoning

Levels." R. 532. Therein, Mr. Steroska responded to the question as to whether an individual

"limited to simple, repetitive jobs tasks with no frequent interaction with the general public"

could perform the jobs of surveillance system monitor, mail sort clerk, and clerical sorter, albeit

they required Reasoning Level 3, 2, and 2 respectively. R. 711. Mr. Steroska responded that in

1989, the job of surveillance system monitor could not be performed by an individual with Mr.

---

[9] The DOT provides SVP times for each occupation: SVP 1-2 corresponds to the definition of "unskilled" work, while SVP 3-4 corresponds to the definition of "semi-skilled" work. *See* SSR 00-4P, 2000 WL 1898704, at *3.

Myers' RFC, but in 2013, the job could be performed at a Reasoning Level 2, according to his professional experience. R. 711. This, he noted, was the only inconsistency between his answers and the DOT. *Id.* Accordingly, Judge Vest determined that Mr. Myers was capable of performing the jobs of mail sorter and clerical sorter, both of which existed in the national economy in significant numbers through Mr. Myers' DLI.

Importantly, Judge Vest failed to elicit responsive testimony from Mr. Steroska regarding the inconsistency identified in the Remand Order, i.e. the discrepancy between Ms. Edwards' proposed jobs and the DOT's classification of each of those jobs as each having either a Reasoning Level 2, 3, or 4. Instead, Judge Vest changed, without explanation, Mr. Myers' RFC to correspond to a different reasoning level, that of Level 2, as opposed to Reasoning Level 1 as determined by Judge Pianin. Indeed, although this change may not be evidenced on the face of Judge Vest's ruling, *compare* R. 20 (holding that Mr. Myers was limited to "sedentary work . . . requir[ing] the performance of only simple and routine 1-2 step tasks), *with* R. 525 (holding that Mr. Myers was limited to "sedentary work . . . . [requiring the] perform[ance] [of] no more than simple, repetitive jobs tasks), it is most apparent in Mr. Steroska's testimony.

After considering the hypothetical individual with Mr. Myers' age, education, work experience and RFC, Mr. Steroska proffered three different jobs, each with either Reasoning Level 2 or 3. Notably, these jobs differed from those proposed by Ms. Edwards at Mr. Myers' prior hearing.[10] *Compare* R. 608-09 (Mr. Steroska's testimony) (proposing the jobs of surveillance system monitor/alarm monitor, mail sort clerk, and clerical sorter), *with* R. 132-33 (Ms. Edwards' testimony) (proposing the jobs of unskilled office clerk, surveillance system

---

[10] The fact that the VEs proposed different jobs at the two hearings is additional evidence of Judge Vest's alteration of Mr. Myers' RFC and attendant Reasoning Level.

monitor, and bench assembler). Mr. Steroska explained that in his professional judgment, the job of surveillance system monitor, which had a Reasoning Level of 3 in 1989, could be performed by an individual with Reasoning Level 2 in 2013. Notably, Mr. Steroska did not explain how this job could be performed at a Reasoning Level 1, nor did he explain how the other jobs, both identified as having Reasoning Level 2, could be performed by an individual with Reasoning Level 1. Thus, instead of reconciling the inconsistency identified in the Remand Order, Judge Vest changed the initial premise of the inquiry: he changed Mr. Myers' Reasoning Level. If Mr. Myers' Reasoning Level had remained the same after remand, Mr. Steroska would have needed to explain how the jobs were consistent with Mr. Myers' Reasoning Level 1. However, Mr. Steroska's testimony and interrogatories are silent as to how the jobs could be performed by an individual with a Reasoning Level 1 precisely because Mr. Steroska had no need to explain this since Judge Vest's new RFC altered Mr. Myers' Reasoning Level.

Moreover, besides Mr. Steroska's testimony as evidence of the change in reasoning level, Judge Vest's omission of Judge Pianin's limitation to only one- or two-step instructions demonstrates the change in Mr. Myers' Reasoning Level. Although the difference between Reasoning Level 1 and 2 is subtle, it hinges on the fact that although "Level 2 reasoning jobs may be simple, they are not limited to *one- or two-step instructions*. That restriction to jobs involving no more than two-step instructions is what distinguishes Level 1 reasoning from Level 2 reasoning." *Grigsby v. Astrue*, No. EDCV 08-1413, 2010 WL 309013, at *2 (C.D. Cal. Jan. 22, 2010) (emphasis in original). Reasoning Level 2, then, is consistent with a claimant's ability to perform "simple, routine tasks" without any limitation to only one- or two-step tasks. *See Snider v. Colvin*, No. 7:12CV539, 2014 WL 793151, at *8 (W.D. Va. Feb. 26, 2014) (finding

24

that an RFC limited to "simple, repetitive, routine tasks" corresponded to Reasoning Level 2);

*Charles v. Astrue*, No. 07-1172, 2008 WL 4003651, at *4 (W.D. La. Aug. 7, 2008) (same);

*Meissi v. Barnhard*, 403 F. Supp. 2d 981, 984 (C.D. Cal. 2005) (same).

Looking at Judge Vest's actions from a different point of view, in terms of syllogistic

logic, the Remand Order identified a specific, and irreconcilable, syllogism:

> The major premise:  Mr. Myers has a RFC with a Reasoning Level 1;
> The minor premise:  An individual with Mr. Myers' age, education,
>       work experience and RFC could perform certain jobs, each with
>       Reasoning Levels of 2, 3, or 4;
> Conclusion:  Mr. Myers could perform these certain jobs.

The Remand Order, then, directed Judge Vest to explain this inconsistent syllogism.

Instead of explaining it, however, he changed the major premise by finding that Mr. Myers had a

Reasoning Level 2. Accordingly, the only inconsistency that Mr. Steroska needed to explain was

how Mr. Myers could potentially perform the job of surveillance system monitor (Reasoning

Level 3), as there was no longer any discrepancy between Mr. Myers's Reasoning Level and the

other identified jobs. Thus, the crux of the issue before the Court is whether Judge Vest was

permitted to alter Mr. Myers' RFC after remand by changing his Reasoning Level, or whether

Judge Vest was limited to only considering the identified discrepancy between Ms. Edwards'

proposed jobs for Mr. Myers and the DOT definitions of those jobs. Mr. Myers objected to

Judge Vest's action of making a new RFC finding on remand on the grounds that the Remand

Order purportedly conclusively established Mr. Myers' reasoning development level at

Reasoning Level 1. ECF No. 10 at 14. The Commissioner did not respond to this specific

argument; rather, the Commissioner argued instead that there was "no merit to Myers' argument"

because "the ALJ elicited testimony/supplemental interrogatories from the VE that fully

addressed any possible conflict between his testimony and the DOT." ECF No. 12 at 26.

### C. Overview of Law-of-the-Case Doctrine and the Mandate Rule

Preliminarily, the Supreme Court of the United States has recognized that "[w]here a court finds that the [Commissioner] has committed a legal or factual error in evaluating a particular claim. . . . [d]eviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." *Sullivan v. Hudson*, 490 U.S. 877, 885-86 (1989) (citations omitted). The ALJ is not free to disregard the district court's order, which may "include detailed instructions concerning the scope of the remand, the evidence to be adduced, and the legal or factual issues to be addressed." *Id.* at 885. This is because "[h]istorically, the system has operated in hierarchical fashion with decisional power vested, in ascending order, in an [ALJ], the Appeals Council, the district court, the court of appeals, and the Supreme Court," so that "the district court overrules the Appeals Council, not the other way around." *Holst v. Bowen*, 637 F. Supp. 145, 147-48 (E.D. Wash. 1986). Two doctrines, then, undergird this system: the law-of-the-case doctrine and the mandate rule.

In its simplest form, the law-of-the-case doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Cold Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988). The mandate rule, then "is merely a 'specific application of the law of the case doctrine,'" [which] in the absence of exceptional circumstances, [] compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." *Bell*, 5 F.3d at 66 (quoting *Bell*, 988 F.2d at 251); *see also Angevine v. Sullivan*, 881 F.2d 519, 520 (7th Cir. 1989) ("[I]ssues previously decided, either explicitly or by

necessary implication, become the law of the case and such determinations are to be applied absent unusual circumstances or compelling reasons."). Thus, upon remand, the trial court is required to "implement both the letter *and the spirit* of the mandate, taking into account the [District Court's] opinion and the circumstances it embraces." *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3rd Cir. 1985) (emphasis added). The relationship between these two doctrines is such that "[w]hen acting under an appellate court's mandate, an inferior court is bound by the decree as the law of the case." *Vizcaino v. U.S. Dist. Ct. for the Western Dist. of Wash.*, 173 F.3d 713, 719 (9th Cir. 1999). Although the Fourth Circuit has held that these principles prevent an ALJ from reconsidering an issue that a district court "expressly held" on, *see Hooper v. Heckler*, 752 F.2d 83, 87-88 (4th Cir. 1985), neither the Fourth Circuit nor this Court have explicitly considered whether an ALJ's reexamination of an issue "necessarily implicated" in a district court's decision is reversible error.[11] However, following a long line of other courts having found such deviation to violate the law-of-the-case doctrine and the mandate rule, including our sister district court, the Southern District of West Virginia, the undersigned finds that when Judge Vest re-evaluated Mr. Myers' RFC and altered his Reasoning Level, he violated this Court's mandate and re-adjudicated an issue already determined under the law-of-the-case doctrine.

## D. The Scope of Judge Jackson's Remand Order

It is necessary to begin the analysis of Judge Vest's actions by outlining the scope of Judge Jackson's Remand Order as it applied to the errors identified therein. Judge Jackson

---

[11] The Fourth Circuit has held in a criminal matter that upon "remand[ing] solely on the issue of the district court's departure below the sentencing guidelines, we impliedly upheld [the defendant's] conviction," such that the defendant was prohibited from litigating his conviction on appeal. *United States v. Lathrop*, 187 F.3d 632, at *1 (4th Cir. Aug. 10, 1999) (unpublished).

identified two general categories of errors: those related to Judge Pianin's credibility determination, and the discrepancy between the VE and DOT. R. 547, 549. Because an ALJ's credibility determination is subsumed within his RFC determination, 20 C.F.R. § 416.945(3) (listing the claimant's "descriptions and observations of your limitations" as included within the "[e]vidence we use to assess your residual functional capacity"), if upon remand the ALJ substantially altered a claimant's prior credibility determination, the RFC and attendant Reasoning Level could permissibly change.

Here, although Judge Vest was authorized to reconsider Mr. and Ms. Myers' credibility, per Judge Jackson's Remand Order, Judge Vest did not actually alter Judge Pianin's credibility determination. Like Judge Pianin, Judge Vest relied on post-1989 evidence, albeit Judge Vest was legally authorized to do so under *Bird, see supra* Section V.1., and both Judge Vest and Judge Pianin discounted Mr. and Ms. Myers' credibility.[12] Accordingly, although the scope of the Remand Order theoretically could have contemplated Judge Vest assigning a new RFC and corresponding Reasoning Level based on a different credibility determination, because Judge Vest assigned the same credibility determination as Judge Pianin, there was no basis for him to reconsider Mr. Myers' Reasoning Level, and he was therefore barred from doing so. In other words, the scope of the Remand Order was contingent on the first identified error of credibility. If in considering Mr. and Ms. Myers' credibility, Judge Vest had substantially changed the credibility determination, the scope of the Remand Order would have expanded to permit re-

---

[12] Notably, Judge Vest appeared to be more generous in his credibility determination of Mr. and Ms. Myers. *Compare* R. 527 (Judge Vest) (finding Mr. and Ms. Myers to be "not entirely credible), *with* R. 21 (Judge Pianin) (discussing Mr. and Ms. Myers' testimony and finding "the claimant's statements . . . not credible). Judge Vest's action of arguably finding Mr. and Ms. Myers to be more credible than did Judge Pianin hardly explains, though, why Judge Vest would assign a higher Reasoning Level to Mr. Myers. If Judge Vest had indeed given Mr. and Ms. Myers' credibility more weight than Judge Pianin, it is incongruous as to how that would result in a higher Reasoning Level. Instead, the inverse should have been true: the more credible the claimant's statements about his impairments, the lower the Reasoning Level assigned.

examination of Mr. Myers' RFC. However, because Judge Vest's credibility determination aligned with Judge Pianin's, the scope of the Remand Order constricted, barring Judge Vest from assigning a new RFC and Reasoning Level.

The analysis does not end simply at the determination that the scope of the Remand Order did not contemplate Judge Vest's alteration of Mr. Myers' Reasoning Level unless he substantially changed the credibility determination. The undersigned still must analyze whether Mr. Myers' RFC was "necessarily implicated" in the Remand Order such that it became part of the law-of-the-case. Without this additional consideration, Judge Vest's assignment of a new Reasoning Level would have been outside the scope of the Remand Order, but not necessarily precluded from his review. Indeed, only if Mr. Myers' Reasoning Level became part of the law-of-the-case, and thus binding on Judge Vest via the mandate rule, would Judge Vest have been barred from reconsidering Mr. Myers' Reasoning Level.

### E.   Mr. Myers' Reasoning Level was "Necessarily Implicated" in Judge Jackson's Remand Order

Although the law-of-the-case doctrine and mandate rule are triggered by the appellate court's decision of a particular issue, the appellate court need not have expressly decided the issue for it to have binding force on the trial court; rather, the issue need only have been "necessarily implicated" in the appellate court's decision. For example, in *Ischay v. Barnhart*, the court found that when a remand order directed an ALJ to revisit step-five in the disability determination, the ALJ was limited to only revisiting that specific step and could not reconsider the claimant's residual functional capacity as subsumed in an earlier step. 383 F. Supp. 2d 1199, 1217-19 (C.D. Cal. 2005). Specifically, the court there rejected the Commissioner's argument that the claimant's RFC had not been adjudicated by the district court, finding instead that the

claimant's RFC was necessarily implicated in the court's decision since the "remand was [only] necessary for the ALJ to obtain additional evidence on one narrow issue." *Id.* at 1218. Because the ALJ was limited to considering only step five of the analysis, the ALJ was "*not* entitle[d] . . . to disturb or revisit his analysis through step four of the sequential process." *Id.* at 1219 (emphasis in original).

Moreover, the Southern District of West Virginia held similarly, citing *Ischay* with approval, in finding that the ALJ was foreclosed from reconsidering the claimant's physical residual functional capacity when the remand order was directed to "obtain[ing] additional evidence about, and to reevaluate, claimant's mental impairment(s)," and "[t]here was no direction given to the Commissioner relative to his physical impairments or residual functional capacity." *Berry v. Astrue*, No. 3:05-1170, 2008 WL 927546, at *2-3 (S.D.W. Va. April 4, 2008). In *Berry*, after the district court remanded for the purpose of reconsidering the claimant's mental impairments, the ALJ also reevaluated the claimant's physical impairments. *Id.* at *4. The initial ALJ had previously determined that the claimant could perform only sedentary work, while the ALJ after remand determined that the claimant could perform light work. *Id.* The court held, then, that "it was error for the [ALJ] to undertake further review of claimant's physical residual functional capacity and to modify it, particularly in a manner that was to his detriment." *Id.*

The undersigned is cognizant of courts which have not liberally applied the law-of-the-case doctrine and mandate rule to issues necessarily implicated in an appellate court's decision. For example, the Northern District of Texas, in *Brown v. Astrue*, held that a district court's remand on one specific step did not imply adoption of the ALJ's findings on the previous steps.

30

597 F. Supp. 2d 691, 699-700 (N.D. Tex. 2009). The *Brown* court voiced strong disagreement with a decision in its own district, *Goundie v. Barnhart*, No. 7:03-cv-0176 (N.D. Tex. Sept. 23, 2004), which had determined that upon remand to reexamine step five "the district court impliedly adopted the [first] ALJ's findings with respect to the first four steps of the sequential evaluation analysis" because "[a]ny other holding would be inconsistent with the rationale of the law of the case doctrine and the mandate rule." *Brown*, 597 F. Supp. at 698-700. Rejecting this argument, the *Brown* court held that because a district court was not bound by the sequential analysis, it could "make narrow rulings regarding subsequent steps . . . without considering administrative determinations made at earlier steps." *Id.* at 700. In so doing, the *Brown* court relied on a Sixth Circuit decision, *Hollins v. Massanari*, 49 F. App'x 533 (6th Cir. 2002). The Sixth Circuit held that a district court's assumption of a claimant's RFC for purposes of adjudicating another claim[13] "did not constitute a decision on the merits regarding [the claimant's] residual functional capacity." *Id.* at 535. The court noted that "[t]he fact that the ALJ made certain factual findings is essential to the district court's holding, but the truth of those findings is not." *Id.* Interestingly, District Judge David Dowd, Jr., sitting by designation, dissented on the grounds that the claimant's RFC had been "a decided issue which should not have been disturbed during the administrative proceedings following remand." *Id.* at 536. He argued that the discrete issue on remand necessarily "assumed that the RFC for light work had been unchallenged," and noted that the Commissioner "did nothing to suggest that he disagreed

---

[13] In this case, the district court determined that the ALJ "mishandled" the consideration of whether the claimant's physical and mental impairments were equivalent to Listing 12.05C. *Id.* at 534. Upon remand for reconsideration of the equivalency issue, the ALJ conducted a *de novo* hearing, re-evaluating the claimant's physical impairments, not just the equivalency issue. *Id.* On appeal to the Sixth Circuit, the claimant challenged the ALJ's re-evaluation of her physical impairments, arguing, *inter alia*, that the district court's decision "established the law of the case as to the issue of her physical capacity." *Id.* at 535.

with an RFC finding of light work." *Id.* at 537. Accordingly, he reasoned that the ALJ was barred from reconsidering the claimant's RFC on remand because the district court's remand order "rendered the unchallenged RFC determination final" even though it "did not expressly verbalize that conclusion." *Id.* at 538.

The undersigned finds the rationale of *Ischay* and *Berry* to be persuasive, along with Judge Dowd's dissenting opinion in *Hollins*.[14] Here, Mr. Myers' Reasoning Level was necessarily implicated in the error identified by Judge Stillman and Judge Jackson because without it, there would not have been any inconsistency between the VE's testimony and the DOT description. The very sequential nature of the ALJ's determination in fact lends itself in support of this argument. Like the courts in *Ischay* and *Berry* reasoned, when the district court identifies an error in one specific step of the ALJ's consideration, the previous steps become necessarily implicated in the district court's decision because all the prior steps are essential to the final step. Indeed, an error identified in a latter step builds off the analysis of those before. Applying the opposite rule, that enunciated in *Brown* and *Hollins* yields absurd results as evinced in the very case at hand. Here, the identified error was premised on Mr. Myers' Reasoning Level, as determined by Judge Pianin, and when instructed to explain the discrepancy, Judge Vest simply changed the Reasoning Level, as opposed to doing the very thing instructed by the District Court. Indeed, Judge Jackson's Remand Order could not have been more explicit: it identified Mr. Myers' Reasoning Level, the VE's proposed jobs, and the DOT definitions, and then directed the ALJ to "elicit an[] explanation for the discrepancies between the VE testimony and DOT descriptions for each of the jobs that the VE identified." R. 549. Such disregard for

---

[14] Examples of this rationale are not limited to the aforementioned cases. *See Calderon v. Astrue*, 683 F. Supp. 2d 273, 276-77(E.D.N.Y. 2010); *Ozbun v. Callahan*, 968 F. Supp. 478, 480 (S.D. Iowa 1997); *Carrillo v. Heckler*, 599 F. Supp. 1164, 1168 (S.D.N.Y. 1984).

the directives of this Court disrupts the very nature of the hierarchical system of Social Security Appeals. At no point did the Remand Order contemplate Judge Vest changing Mr. Myers' Reasoning Level as an appropriate response to the directive to explain the discrepancy between the VE's testimony and the DOT. Instead, the Remand Order identified one particular error that was premised on Mr. Myers' Reasoning Level. Thus, Judge Vest's only course of action, as controlled by this Court's mandate, was to explain the discrepancy between the jobs proposed by Ms. Edwards and the DOT definitions of those jobs, considering Mr. Myers' Reasoning Level 1. Judge Vest was not at liberty to change Mr. Myers' Reasoning Level as an appropriate answer to this Court's mandate.[15] Despite the ALJ's failure to adhere to the Court's previous remand Order, at this juncture an award of benefits is premature because the VE may be able to reconcile the discrepancy between the jobs identified in the national economy and Mr. Myers' Reasoning Level, which the Commissioner was directed to do in the first place.[16]

## VI. RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** the defendant's motion for summary judgment be **DENIED**, the plaintiff's motion for summary judgment be **GRANTED** to the extent it seeks reversal and remand of the Commissioner's decision, and **DENIED** to the extent that it seeks entry of an order directing the award of benefits, and the Commissioner's

---

[15] None of the exceptions to the mandate rule appear to apply in this case. The exceptions include: "(1) a 'show[ing] that controlling legal authority has changed dramatically; [ (2) that] significant new evidence, not earlier obtainable in the exercise of due diligence[, has come to light]; or . . . [ (3) ] that a blatant error in the prior decision will, if uncorrected, result in serious injustice.'" *Bell*, 5 F.3d at 67 (alteration in original) (quoting *Bell*, 988 F.2d at 251). Judge Vest did not explicitly identify that he was changing the reasoning level assigned by Judge Pianin, let alone provide an explanation for the change.

[16] Similar to the Mr. Steroska's testimony that the job of surveillance systems monitor, performed at a Reasoning Level 3 according to the DOT, could be performed at a Reasoning Level 2 based on his professional judgment, it may be that the jobs identified by VE Edwards, although categorized by the DOT as requiring Reasoning Level 2, could be performed at Mr. Myers' Reasoning Level 1. Of course, this speculation is the reason why the matter was remanded the first time.

decision be **VACATED** and **REMANDED** specifically for an explanation of the discrepancy between the jobs identified by the VE, Ms. Edwards, and the DOT definitions of those jobs in light of Mr. Myers' Reasoning Level 1.

## VII. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a) plus three days permitted by Federal Rule of Civil Procedure Rule 6(d). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the *pro se*

Plaintiff and counsel of record for the Respondent.

LAWRENCE R. LEONARD
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
December 24, 2014

## CLERK'S MAILING CERTIFICATE

A copy of this Report and Recommendation was mailed on this date to the following:

Mr. Everett M. Myers
18306 Morgarts Beach Road
Smithfield, Virginia 23430
*Pro Se* Plaintiff

Ms. Susan Lynn Watt
United States Attorney's Office
101 W. Main Street, Suite 8000
Norfolk, Virginia 23510
Counsel for the Defendant

Fernando Galindo,
Clerk of Court

/s/ **T. Brown**

By:  _____

Deputy Clerk
December ⎯24⎯, 2014